**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Franklin TAYLOR, Defendant–Appellee.**

**No. 01SA333.**

Supreme Court of Colorado, En Banc.

Feb. 25, 2002.

---

Paul R. McLimans, District Attorney, Fourteenth Judicial District, David M. Waite, Deputy District Attorney, Bonnie S. Roesink, Deputy District Attorney, Craig, CO, Attorneys for Plaintiff–Appellant.

Oliphant, Hammond, O'Hara & Atwell, Kristopher L. Hammond, Steamboat Springs, CO, Thomas K. Carberry, Denver, CO, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

The prosecution filed this interlocutory appeal pursuant to C.A.R. 4.1 challenging an order of the Moffat County District Court suppressing certain statements made by Defendant Franklin Taylor. For the reasons set forth below, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

On February 6th, 2001 Defendant and his passenger, Jennifer Tafoya, were in Defendant's vehicle heading westbound on West Victory Way in Craig, Colorado. Officer Russell Bradford observed Ms. Tafoya in Defendant's vehicle and, aware that there were warrants outstanding for her arrest, informed City of Craig Police Officer Brian Soper of Ms. Tafoya's location. In order to effect Ms. Tafoya's arrest, Officer Soper activated the lights on his patrol car, signaling

Defendant to stop his vehicle. In response, Defendant pulled his vehicle into the Centennial Mall parking lot. Officer Soper parked his patrol car immediately behind Defendant's vehicle. Officer Soper testified that Defendant had not committed any traffic violations and was only pulled over because Ms. Tafoya was a passenger in his car.

Officer Soper then approached Defendant's vehicle and informed Defendant that he had been stopped because there were outstanding warrants for Ms. Tafoya's arrest. The officer then arrested Ms. Tafoya by removing her from the passenger's seat, handcuffing her, and placing her in the back seat of his patrol car. She was arrested at 5:38 p.m., about two minutes after Defendant was stopped.

Officer Corey Wagner arrived on the scene to assist Officer Soper and also parked immediately behind Defendant's vehicle. Officer Bradford, in plainclothes and driving an unmarked Jeep Cherokee, arrived sometime thereafter and parked a short distance away. Although close by, he apparently did not leave his vehicle until after Defendant had been formally arrested. Both Officers Soper and Wagner were armed and in uniform, but neither displayed their weapons during the course of the encounter. After Officer Wagner's arrival, Officer Soper reinitiated contact with Defendant, requested his driver's license, retained it,[1] and advised him that they were going to conduct a search incident to arrest.[2] Officer Soper instructed Defendant to exit the vehicle and, placing his hand upon Defendant's shoulder, escorted him to the rear of the vehicle where Officer Wagner was waiting. Officer Wagner instructed Defendant to place his hands in the air, and after he did so, Officer Wagner frisked Defendant. Defendant volunteered one knife found on his person, and Officer Wagner discovered three more during the patdown for weapons. Officer Wagner kept all the knives.

When asked whether he had "any problem with" the officers searching his vehicle, De-

fendant responded that he preferred the officers not conduct a search. Officer Soper informed Defendant that the search would proceed regardless and that if there were items in the vehicle that were not his he should so inform them. Defendant said that Ms. Tafoya had placed her purse on the floorboard of the passenger seat but was not sure if she had dropped anything else. While Officer Wagner kept an eye on Defendant, Officer Soper conducted a search of the vehicle's passenger compartment.

The trial court found that Officer Wagner placed Defendant between himself and the vehicle such that Defendant was "essentially pinned" against the back of the vehicle and could not have left without "making a physical maneuver around Officer Wagner." (R. at vol. II, p. 127, 129.) Moreover, when Defendant attempted to move toward the passenger compartment of his vehicle in order to observe the search, Officer Wagner physically restrained him by extending his arm to prevent Defendant's movement toward the passenger compartment.

During the search, Officer Soper discovered a small black case in the vehicle containing what appeared to be drug paraphernalia and a white powdery substance. Returning to the rear of the vehicle where Officer Wagner and Defendant were standing, Officer Soper showed the case to Defendant and asked whether it was his and, if so, what it contained. Defendant, "surrounded by the truck and each of the officers," (R. at vol. II, p. 129), admitted the case was his and that it contained a small amount of cocaine. As a result, the officers informed Defendant that he was under arrest, handcuffed him, and placed him in Officer Wagner's patrol car. Approximately nineteen minutes had passed since Ms. Tafoya's arrest. He was not read his *Miranda*[3] rights either before or after he made the inculpatory statements.

At the jail, during routine intake procedures, Detention Officer Falk asked Defen-

---

1. Defendant's driver's license was never returned to him.

2. Although Officers Soper and Wagner informed Defendant repeatedly that the search of Defendant's vehicle was incident to arrest, they did not indicate each and every time that it was incident to the arrest of Jennifer Tafoya. However, De-

fendant admitted that he was told his vehicle was being searched incident to the arrest of Ms. Tafoya.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

dant whether he had ingested any illegal substances, and Defendant responded that he had used cocaine earlier in the day. Defendant still had not been advised of his *Miranda* rights. In fact, it was not until Colorado State Patrol Officer Hilling interviewed Defendant later in the evening that he was given *Miranda* warnings.

Officer Hilling, a drug recognition expert, was called to the jail to determine whether Defendant was under the influence of illegal substances. Defendant was moved from a holding cell to a conference room where the interview occurred. He was not handcuffed, and both he and Officer Hilling were dressed in plainclothes. Officer Hilling advised Defendant of his *Miranda* rights, and then inquired whether Defendant wanted to talk. Defendant said that he would talk "for a while." (R. at vol. II, p. 104.) When asked whether he had used drugs earlier in the day, Defendant said that he had used drugs earlier that day at approximately 4:00 p.m. When asked how commonly he used drugs, Defendant responded that he used between a half a gram and a gram a month. Defendant also showed Officer Hilling the needle marks on his arm. The trial court found that the interview was "relaxed and casual." (R. at vol. II, p. 133.)

Defendant moved to suppress the inculpatory statements he made in response to the questions posed by Officer Soper at the scene of his arrest, and by Officers Falk and Hilling at the jail. The trial court found that "there was clearly some kind of a detention," (R. at vol. II, p. 129), even though "Mr. Taylor wasn't suspected of having engaged in any criminal activity." *Id.* It also found that at the time Officer Soper inquired about the ownership and contents of the small black case Defendant was surrounded by armed uniformed police officers and their patrol

cars and was "essentially encircled next to the pickup truck." (R. at vol. II, p. 130.) Accordingly, the trial court concluded these questions constituted custodial interrogation, and because Defendant had not yet been advised of his *Miranda* rights, the trial court suppressed his inculpatory responses. The trial court did find, however, that these statements were voluntarily made.

The trial court also suppressed the statements Defendant made at the jail. The prosecution conceded that Officer Falk's question constituted custodial interrogation, and thus, because Defendant had not yet been given *Miranda* warnings, the trial court suppressed Defendant's statement made in response thereto. The trial court also suppressed the statements made in response to the questions posed by Officer Hilling. It found that Defendant had been advised of his *Miranda* rights, had "knowingly, intelligently, and voluntarily" waived those rights, and had voluntarily made the inculpatory statements. However, the trial court reasoned that the statements must nonetheless be suppressed as fruits of Defendant's prior inculpatory statements.

The prosecution appealed. We now affirm in part and reverse in part and remand this case for further proceedings consistent with this opinion.

## II. PRE–ARREST STATEMENTS

Although this case is primarily concerned with protecting Defendant's Fifth Amendment right against self-incrimination, we must, as a preliminary matter, also consider whether Defendant's Fourth Amendment rights were violated by the stop of his vehicle. One of the factors on which the trial court premised its conclusion that the police violated Defendant's Fifth Amendment rights was its finding that Defendant had been impermissibly detained.[4] The prosecution dis-

---

4. The trial court explained:

> To be honest ... I may have found differently if this was a situation where there was some legitimate reason to stop Mr. Taylor; [if] Mr. Taylor himself was suspected of having committed some kind of offense and they were going through this routine then, but under the circumstances ... he's essentially an innocent bystander they have placed under restrictions.

(R. at vol. II., p. 131.) Of course, if the stop of Defendant's vehicle constituted an unreasonable

seizure within the meaning of the Fourth Amendment, then Defendant's inculpatory statements would have to be suppressed as fruits of this poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Rodriguez*, 945 P.2d 1351, 1363–64 (Colo.1997). Suppression of the inculpatory statements on this Fourth Amendment ground would render an inquiry into whether these statements were obtained in violation of *Miranda* moot.

putes this finding and argues the legitimacy of the stop to this court.[5] Because the Fourth and Fifth Amendment issues raised by this case are inextricable, we consider both.

## A. FOURTH AMENDMENT

■ The Fourth Amendment to the United States Constitution provides that the people shall "be secure in their ... persons against unreasonable searches and seizures." U.S. Const. amend. IV. It is enforceable against the states through the Fourteenth Amendment. *Colorado v. Bannister*, 449 U.S. 1, 2, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980) (per curiam). "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (internal footnotes and quotation marks omitted); *accord Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1983); *People v. Paynter*, 955 P.2d 68, 71 (Colo.1998). Because the "touchstone of the Fourth Amendment is reasonableness," *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), both this court and the United States Supreme Court have eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. *Id.; Outlaw v. People*, 17 P.3d 150, 155 (Colo.2001) ("A totality of the circumstances analysis requires an examination of the behavior of the parties, as well as the physical, temporal, and social context of the encounter."); *Paynter*, 955 P.2d at 72–73. "Reasonableness ... is measured in objective terms by examining the totality of the circumstances." *Robinette*, 519 U.S. at 39, 117 S.Ct. 417.

■ Accordingly, "not all personal intercourse between the police and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *accord Paynter*, 955 P.2d at 71; *see also Terry*, 392 U.S. at 16, 88 S.Ct. 1868 (holding that a person is seized within the meaning of the Fourth Amendment "whenever a police officer accosts an individual and restrains his freedom to walk away").

We have articulated the specific test for determining if a seizure has occurred as whether, under the totality of the circumstances, an encounter between a police officer and a citizen is so intimidating as to demonstrate that a reasonable, innocent person would not feel free to decline the officers' requests or otherwise terminate the encounter. *People v. Jackson*, 39 P.3d 1174, 1183 (Colo.2002). This test is objective and presupposes an innocent person. *Whren v. United States*, 517 U.S. 806, 813–14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *accord Jackson*, 39 P.3d at 1182. Under this test, we have said that a driver stopped by the flashing lights and blaring sirens of a police vehicle is usually seized within the meaning of the Fourth Amendment. *Jackson*, 39 P.3d at 1185 ("Our precedent recognizes that the flashing lights and overhead sirens used to

---

**5.** In its answer brief the People argue that:

[T]he statements made to the officers at the scene of the stop were not a result of custodial interrogation, but were statements made to the officers during the course of an investigatory stop and should not be suppressed ... This stop was nothing more than an investigatory stop, and the fact that the defendant was not suspected of a crime only makes his detention coincidental to the valid stop for purposes of execution of an arrest warrant (the reasonable suspicion) and subsequent valid search incident to that arrest. This case is indistinguish-

able from the result reached by the court in *People v. In the Interest of H.J.*, 931 P.2d 1177 (Colo.1997), where the court found that the detention of a passenger in a vehicle was valid as being coincidental to the reasonable suspicion applicable to the driver of the vehicle. In the instant case, the roles are merely reversed. The defendant's detention was merely coincidental to the arrest of his passenger and the search of his car, and could only be termed an investigatory stop....

People's Opening Brief at 6, 12.

effect a 'full-blown' traffic stop are a display of authority and control indicative of an investigatory stop.") (citing *Paynter,* 955 P.2d at 73 and *People v. Cascio,* 932 P.2d 1381, 1388 (Colo.1997)); *People v. H.J.,* 931 P.2d 1177, 1181 (Colo.1997) ("It strains credulity to imagine that any citizen directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel 'free to leave' or 'at liberty to ignore the police presence and go about his business.' " (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382)); *see also Colorado v. Bannister,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980); *Prouse,* 440 U.S. at 653, 99 S.Ct. 1391.

■ In this case, Officer Soper activated the lights on his patrol car, signaling Defendant to stop his vehicle. Defendant yielded to this show of official control and authority by pulling his vehicle into the Centennial Mall parking lot. Officer Soper then parked his patrol car immediately behind Defendant's vehicle. At this point, and under these circumstances, Defendant was seized within the meaning of the Fourth Amendment.

■ However, only unreasonable seizures violate the Fourth Amendment. *United States v. Brignoni Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.; see also Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Camara*

*v. Mun. Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Discussing how to reach an appropriate balance between the public interest and personal security in *Prouse,*[6] the Supreme Court explained:

> Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field.

440 U.S. at 654–55, 99 S.Ct. 1391 (internal footnotes and quotation marks omitted).

■ Our traditional method of ascertaining the reasonableness of Fourth Amendment seizures—analyzing whether officers had probable cause justifying an arrest of an individual or reasonable suspicion justifying an investigatory stop of an individual—is too rigid a framework to resolve the issue before us. The seizure of Defendant occasioned by the stop of his vehicle constituted neither an arrest nor an investigatory stop. Officer Soper testified that the only reason he stopped Defendant's vehicle was to effect the arrest of Ms. Tafoya. He harbored absolutely no suspicion whatsoever that Defendant was engaged in any criminal wrongdoing; Defendant committed no traffic violation and did not exhibit any aberrant behavior. Furthermore, the mere fact that there was probable cause to arrest Defendant's passenger certainly could not furnish probable cause to arrest Defendant, nor could it constitute reasonable suspicion that Defendant was engaged in criminal activity. *Cf. Ybarra v.*

**6.** *Prouse* considered:

> [W]hether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or

> that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law. 440 U.S. at 650, 99 S.Ct. 1391. The Court held that this practice violated the Fourth Amendment: "Were the individual subject to unfettered governmental intrusion everytime he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed." *Id.* at 673, 99 S.Ct. 1391.

*Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("The mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). Where the standard is probable cause or reasonable suspicion:

> [A] search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Ybarra,* 444 U.S. at 91, 100 S.Ct. 338.

This case therefore presents one of those rare situations alluded to in *Prouse* "in which the balance of interests precludes insistence upon some quantum of individualized suspicion" that Defendant is engaged in criminal activity to justify a seizure. 440 U.S. at 654–55, 99 S.Ct. 1391; *Martinez–Fuerte,* 428 U.S. at 560–61, 96 S.Ct. 3074 ("[T]o accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure. But the Fourth Amendment imposes no irreducible requirement of such suspicion."). However, under the facts of our case, another objective and equally satisfactory safeguard existed to protect Defendant from the unfettered discretion of officers in the field: Officer Soper had probable cause to arrest Ms. Tafoya, and stopping Defendant's vehicle was necessary to effect her arrest. *See Prouse,* 440 U.S. at 655, 99 S.Ct. 1391 ("[T]he reasonableness standard usually requires ... that the facts upon which an intrusion is based be capable of measurement against an objective standard." (internal footnotes and quotation marks omitted)).

■ Weighing the public interest against the individual's right to personal security free from arbitrary interference by law officers, we conclude that the seizure of Defendant was reasonable. On the one hand, we can hardly imagine a more compelling public interest than securing the arrest of wanted criminals. On the other, requiring Defendant to pull to the side of the road so that the officers could arrest his passenger was a relatively minimal intrusion. *See Brignoni–Ponce,* 422 U.S. at 879–80, 95 S.Ct. 2574

("[T]he interference with individual liberty that results when an officer stops an automobile and questions its occupants ... is modest."). Accordingly, the need to effect the arrest of Ms. Tafoya warranted the intrusion on Defendant's Fourth Amendment rights, and the scope of the intrusion was reasonably related to the circumstances which justified the interference in the first place. *See H.J.,* 931 P.2d at 1180 ("The question of reasonableness under *Terry* is twofold: (1) whether the facts warranted the intrusion on the individual's Fourth Amendment rights, and (2) whether the scope of the intrusion was reasonably related to the circumstances which justified the interference in the first place." (internal quotation marks omitted)). Furthermore, the officers did not arbitrarily interfere with Defendant's right to personal security. In contrast to the wholly random spot check struck down by the United States Supreme Court in *Prouse,* probable cause to arrest Ms. Tafoya constituted an objectively measurable reason for stopping Defendant's vehicle, and thus adequately circumscribed the "standardless and unconstrained discretion ... of the official in the field" with which *Prouse* was so concerned. *Prouse,* 440 U.S. at 661, 99 S.Ct. 1391; *see also Colorado v. Bannister,* 449 U.S. at 3, 101 S.Ct. 42 ("[I]f there was probable cause that the contents of the automobile offend against the law, the warrantless seizure was permissible."); *cf. Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. 2574 ("[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.").

■ However, probable cause to arrest Ms. Tafoya only justified the limited seizure occasioned by stopping Defendant's vehicle. Once Ms. Tafoya was arrested, the officers no longer had any justification to detain Defendant until they found the cocaine. *Cf. People v. Redinger,* 906 P.2d 81, 83 (Colo. 1995) (holding that once the purpose of an initially valid investigatory stop has been satisfied, any further detention or questioning of the driver of the vehicle constitutes unreasonable and therefore unlawful detention prohibited by the Fourth Amendment).

Nevertheless, the officers were authorized to conduct a search of Defendant's vehicle incident to the arrest of Ms. Tafoya. *See New York v. Belton*, 453 U.S. 454, 460–62, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *People v. H.J.*, 931 P.2d 1177, 1183 (Colo.1997). In *H.J.*, we held that:

> [W]hen an officer has made a lawful custodial arrest of an occupant of a vehicle, the officer may search the entire interior of the passenger compartment, even if the subject has already been removed from the vehicle. The authority to search the passenger compartment incident to arrest is automatic, and does not depend upon the specific facts of each case.

■ *H.J.*, 931 P.2d at 1183. Thus, Defendant was not at liberty to remove his vehicle from the scene of Ms. Tafoya's arrest until the officers completed their search. Moreover, the time Defendant waited while the officers conducted a search of his vehicle incident to the arrest of his passenger, constitutes only an incidental delay, not a seizure, and therefore itself has no constitutional significance. *Cf. Jackson*, 39 P.3d at 1186 ("The incidental delay of a passenger stopped as a practical matter by virtue of the stop of the vehicle is not a seizure within the meaning of the Fourth Amendment." (internal quotation marks omitted)).

Because we hold that the stop was constitutionally permissible, and because the arrest of Defendant's passenger was constitutional, it necessarily follows that the cocaine found by the officers in Defendant's vehicle is the fruit, not of an unlawful seizure, but of a lawful search incident to the arrest of Defendant's passenger. It is therefore unnecessary for us to decide whether the officers' actions after stopping the vehicle but prior to finding the cocaine constituted a seizure of Defendant. As we have already pointed out, once Defendant had stopped his vehicle and his passenger had been arrested, the officers had no constitutionally sufficient reason to detain him further until they found the co-

caine, but because the cocaine was found pursuant to a search incident to the lawful arrest of Defendant's passenger, and not as a result of Defendant's detention, Fourth Amendment exclusionary principles do not apply to its discovery. Once this cocaine was discovered—in Defendant's truck on his side of the vehicle—the officers had at least the reasonable suspicion necessary to detain Defendant consistent with the Fourth Amendment. Accordingly, the inculpatory statements were not the fruit of an illegal seizure.

We must still determine, however, whether Defendant's statements were obtained consistent with the Fifth Amendment. If procured by "custodial interrogation," then these statements must nonetheless be suppressed, but for quite different reasons. *Oregon v. Elstad*, 470 U.S. 298, 303–09, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

## B. FIFTH AMENDMENT

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment governs state as well as federal criminal proceedings. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). To protect this right, the United States Supreme Court handed down its opinion in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prohibiting the admission at trial of incriminating statements made during custodial interrogation unless the police first give the defendant certain warnings.[7] *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. *Miranda* also applies to the states. *Dickerson v. United States*, 530 U.S. 428, 432, 438–39, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In *Miranda*, the court defined custodial interrogation as "questioning initiated by law enforcement officers. after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Mi-*

---

7. With regard to the specific warnings to be given, *Miranda* pronounced:

> [U]nless other fully effective means are devised to inform the accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person

must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of any attorney, either retained or appointed.

*Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

*randa,* 384 U.S. at 444, 86 S.Ct. 1602. Subsequent to the *Miranda* decision, the Court has elaborated on both components of the definition of custodial interrogation.

Interrogation, the court explained in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1981), "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. 1682. Because the prosecution conceded that the questions asked at the jail by Officers Falk and Hilling constituted interrogation, we do not consider this issue further. As for the questions asked by Officer Soper at the scene—to whom did the black case belong and what did it contain—it is beyond argument that they too constituted interrogation as defined by *Innis* and found by the trial court. (R. at vol. II, p. 135.) The more difficult question is whether Defendant was in custody when interrogated by Officer Soper.

*Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), which considered whether the defendant was "in custody" when he made incriminating statements during a routine traffic stop, is instructive.[8] The officer in *Berkemer* pulled Defendant over for driving erratically. 486 U.S. at 423,

108 S.Ct. 1886. After he failed a field sobriety test, the officer asked the defendant whether he had been using intoxicants. *Id.* The defendant admitted that he had "consumed two beers and had smoked several joints of marijuana a short time before" and was formally placed under arrest. *Id.* The defendant argued that this statement was the product of custodial interrogation and must be suppressed because it was made before he had been given *Miranda* warnings, but the Court disagreed.

The Court acknowledged that a routine traffic stop "significantly curtails the freedom of action of the driver ... of the detained vehicle," but framed the determinative inquiry as "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer,* 468 U.S. at 436–37, 104 S.Ct. 3138 (internal quotations marks omitted). "Where the suspect's freedom of action has been curtailed to a 'degree associated with formal arrest,' " the Court continued, *Miranda* warnings must be given. *Id.* at 440, 86 S.Ct. 1602 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his

---

**8.** *Berkemer* makes clear and we have recognized that whether a person is seized under the Fourth Amendment and whether a person is "in custody" for purposes of *Miranda* are constitutionally distinct inquiries. *Berkemer,* 468 U.S. at 439–440, 104 S.Ct. 3138; *People v. Polander,* 41 P.3d 698, at 705 (Colo. 2001) ("Under *Berkemer,* the question is not whether a reasonable person would believe he was not free to leave, but rather whether such person would believe he was in police custody of the degree associated with a formal arrest.") (quoting 1 Wayne R. Lafave & Jerold H. Israel, Criminal Procedure § 6.6(c), at 526 (2d ed.1999)); *People v. Breidenbach,* 875 P.2d 879, 885 (Colo.1994) ("Although an investigatory stop is a 'seizure' within the meaning of the Fourth Amendment, this does not necessarily mean that the suspect is 'in custody' for purposes of *Miranda.*"); *see also United States v. Sullivan,* 138 F.3d 126, 131 (4th Cir.1998) ("The 'custody' that implicates the *Miranda* rule is conceptually distinct from a seizure implicating the Fourth Amendment."); *United States v. Perdue,* 8 F.3d

1455, 1461 (10th Cir.1993) ("In relying on Fourth Amendment doctrine to determine whether [the defendant] ... should have been advised of his *Miranda* rights, the district court merged several distinct constitutional inquiries into one."); *United States v. Smith,* 3 F.3d 1088, 1097 (7th Cir.1993) (reasoning that because basis for *Miranda* decision was "the need to protect the fairness of the trial" and because "there is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment," "a completely different analysis of the circumstances" is required under the Fifth Amendment than under the Fourth); *United States v. Streifel,* 781 F.2d 953, 961 (1st Cir.1986) ("*Berkemer* indicates that, in a non-stationhouse setting, *Miranda* is *not* triggered simply because a person detained by the police has reasonable cause to believe that he is not free to leave. Rather, a host of factors must be considered in order to determine whether the 'suspect's freedom of action is curtailed *to a degree associated with a formal arrest.*' " (internal quotation marks omitted) (emphasis in original)).

situation." 468 U.S. at 442, 104 S.Ct. 3138. And thus, "a policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Id.* However, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury v. California,* 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). But, "those beliefs are only relevant to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.*

The *Berkemer* court reasoned that two features in particular of an ordinary traffic stop "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.' " *Id.* at 437, 104 S.Ct. 3138 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." *Id.* "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 438, 86 S.Ct. 1602. Accordingly, the Court held that, the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" [9]

The Court warned however that, "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treat-ment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" [10] *Id.* at 440, 86 S.Ct. 1602; *see also Pennsylvania v. Bruder,* 488 U.S. 9, 10 n. 1, 109 S.Ct. 205, 102 L.Ed.2d 172 (per curiam) (pointing out that *Berkemer* did not announce an absolute rule for all motorist detentions and admonishing lower courts to be vigilant in ensuring that police do not "delay formally arresting detained motorists, and ... subject them to sustained and intimidating interrogation at the scene of their initial detention"); *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517, 518–19, 522 (1980) (holding that police questioning was custodial interrogation because defendant was questioned more than one-half hour after being told he would have to remain at the scene until investigating officer arrived, and the defendant had to wait part of the time in a patrol car) (cited with approval in *Berkemer* and *Bruder* for the proposition that custody can result from an "unusual traffic stop that involves prolonged detention").

Consistent with *Berkemer,* we have held that the question of custody "turns on an objective assessment of whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Polander,* 41 P.3d at 705; *People v. Reddersen,* 992 P.2d 1176, 1180 (Colo.2000); *People v. Wallace,* 724 P.2d 670, 673 (Colo. 1986). Attempting to shed light on the "slippery" [11] task of determining whether a per-

---

9. We explicitly adopted *Berkemer* in *People v. Archuleta,* 719 P.2d 1091, 1093 (Colo.1986), holding that "the roadside questioning of a motorist detained pursuant to a routine traffic stop does not necessarily constitute 'custodial interrogation' for the purpose of the rule established in *Miranda.*" 719 P.2d at 1093.

10. In *Archuleta,* we too acknowledged, that if during a traffic stop, "a motorist's freedom of action is curtailed to a 'degree associated with formal arrest,' " then " 'he is entitled to the full panoply of protections prescribed by *Miranda.*' " *Archuleta,* 719 P.2d at 1093 (quoting *Berkemer,* 468 U.S. at 440, 104 S.Ct. 3138); *accord Id.* (Quinn, C.J., specially concurring) (agreeing that questioning pursuant to a routine traffic stop does not constitute custodial interrogation under *Miranda* and *Berkemer* but emphasizing that *Mi-*

*randa* warnings must still be given "when, from the words or actions of the officer or from other circumstances surrounding the stop, a reasonable person in the motorist's situation would have understood that he was being subjected not to a routine traffic stop but to the functional equivalent of a formal arrest"); *see also People v. Reddersen,* 992 P.2d 1176, 1180 (Colo.2000) (holding that the protections afforded by *Miranda* need not be applied during a traffic stop unless the defendant's freedom of action is curtailed to a degree associated with formal arrest).

11. *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285 ("Unfortunately, the task of defining 'custody' is a slippery one, and policemen investigating serious crimes cannot realistically be expected make no error whatsoever." (internal quotation omitted)).

son is in custody under the totality of the circumstances, we have listed several relevant factors:

> The time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officers tone of voice and general demeanor; the length or mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*People v. Thiret*, 685 P.2d 193, 203 (Colo. 1984).

Considering these factors, we have held on numerous occasions that circumstances akin to the "routine traffic stop" at issue in *Berkemer* do not constitute custody for purposes of *Miranda*. *See Reddersen*, 992 P.2d at 1180–81; *People v. Wallace*, 724 P.2d at 673–74; *People v. Archuleta*, 719 P.2d at 1093. Like the Supreme Court in *Berkemer*, we have cited the brief nature of the detention and the absence of a police dominated environment as particularly persuasive in reaching the conclusion that the circumstances were not so coercive as to warrant the protection afforded by *Miranda*. *See e.g., Reddersen*, 992 P.2d at 1180–81. Also important to our analysis in these cases was the fact that the defendants were not physically restrained prior to being questioned. *Reddersen*, 992 P.2d at 1181; *Wallace*, 724 P.2d at 674.

In contrast to *Reddersen, Wallace,* and *Archuleta, Polander* highlights factors indicative of custodial situations. In *Polander*, a case in which we found that the defendant was in custody, two police officers parked behind, and then approached, a van containing numerous occupants. 41 P.3d at 701. After discovering narcotics on the driver, he was handcuffed and instructed to sit on a nearby curve. *Id.* Defendant was then frisked and instructed to sit next to the driver. *Id.* at 701. A search of the van revealed a purse and a purple "Crown Royal" bag containing cocaine. *Id.* The officers asked to whom these items belonged, and the defendant admitted that they were hers. *Id.*

We held that this response must be suppressed because it was the product of custodial interrogation:

> Polander was seized and subjected to a question about the ownership of contraband, under circumstances in which it was apparent to all that the police had grounds to arrest the occupants of the vehicle. Whether or not the police had announced that her seizure was elevated in their minds from an investigatory stop to an arrest, it is clear that the defendant had every reason to believe that she would not be briefly detained and then released as in the case of an investigatory stop or a stop for a minor offense. Under these circumstances the defendant's freedom of action was curtailed to a degree associated with formal arrest.

*Id.* at 705.

■ The case before us today differs in significant ways from the "routine traffic stops" in *Reddersen, Wallace,* and *Archuleta* but has much in common with the facts of *Polander.* Unlike a routine traffic stop, Defendant was pulled over, not because he had violated any law, but because there was a warrant for Ms. Tafoya's arrest. However, once Ms. Tafoya was arrested, the officers asked for and kept Defendant's license, removed him from the vehicle, and with Officer Soper's hand on his shoulder, escorted Defendant to the rear of the vehicle. At the rear of the vehicle, Officer Wagner frisked Defendant, kept four knives Defendant had on him, and "essentially pinned" him against the back of the vehicle such that Defendant could not have left without "making a physical maneuver around Officer Wagner." (R. at vol. II., pp. 127, 129.) While Officer Soper searched Defendant's vehicle, Officer Wagner physically restrained Defendant by extending his arm to prevent Defendant from moving toward the passenger compartment of his vehicle. By the time Defendant was shown the black case and asked whether it was his and what it contained, there were three officers on the scene, two armed and in uniform, and Defendant had already been detained approximately nineteen minutes. When he made the incriminating statements,

the trial court found that Defendant was surrounded by armed uniformed police officers and their patrol cars and was "essentially encircled next to the pickup truck while the interrogation occurred." (R. at vol. II., pp. 129–30.) In other words, he was "completely at the mercy of the police." *Berkemer,* 468 U.S. at 438, 104 S.Ct. 3138.

Unlike the routine traffic stops at issue in *Berkemer, Archuleta, Wallace,* and *Reddersen,* therefore, this was a relatively lengthy detention in a police dominated atmosphere where the officers used physical force to control Defendant's movement. Moreover, similar to *Polander,* when Defendant was subjected to the question about ownership of contraband "it was apparent to all that police had grounds to arrest" Defendant and that Defendant "had every reason to believe [he] would not be briefly detained and then released as in the case of an investigatory stop or a stop for a minor offense." *Polander,* 41 P.3d at 705; *see also Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526 ("[A]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."). The police officers in this case curtailed Defendant's freedom of action "to a degree associated with a formal arrest" and exerted pressures that "sufficiently impair[ ] [Defendant's] exercise of his privilege against self incrimination to require that he be warned of his constitutional rights." *Berkemer,* 468 U.S. at 436–37, 440, 104 S.Ct. 3138. Thus, this case is analogous to the situation warned about in *Berkemer* where a motorist detained pursuant to a traffic stop is thereafter subjected to treatment that renders him "in custody" for practical purposes. *Berkemer,* 468 U.S. at 440, 104 S.Ct. 3138; *see also Archuleta,* 719 P.2d at 1093 (Quinn, C.J., specially concurring); *Meyer* 412 A.2d at 518–19, 522. Accordingly, under these circumstances, we find that Defendant was in custody when he made the inculpatory statements. Therefore, because Defendant had not yet been advised of his *Miranda* rights, we affirm the trial court's suppression of these statements.

## C.  POST–ARREST STATEMENTS

Because the prosecution has conceded that the statements Defendant made to Detention Officer Falk during routine intake procedures at the jail were procured by custodial interrogation without *Miranda* warnings, we do not address the trial court's suppression of these statements. As for the inculpatory statements made to Officer Hilling later that evening, we hold that the trial court erred in relying on the fruit of the poisonous tree doctrine to suppress these statements. The trial court found that both the statements made to Officer Soper, although in violation of *Miranda,* and the statements made to Officer Hilling were voluntary. The record supports these findings. Therefore, *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), not the fruit of the poisonous tree doctrine, governs our analysis of whether the statements made to Officer Hilling are admissible.

■■■■■ In *Elstad,* the Supreme Court held that the "fruit of the poisonous tree" doctrine does not apply to confessions obtained after an initial confession that was voluntary but not preceded by *Miranda* warnings. 470 U.S. at 318, 105 S.Ct. 1285. This holding is grounded in the "fundamental difference between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment." *Id.* at 304, 105 S.Ct. 1285. Because its purpose is to deter unreasonable searches and seizures, no matter how probative their fruits, the Fourth Amendment exclusionary rule applies only when there has been an actual violation of the Fourth Amendment. In contrast, because *Miranda* is a prophylactic rule, it "may be triggered even in the absence of a Fifth Amendment violation." *Id.* at 306, 105 S.Ct. 1285. The Fifth Amendment only prohibits the use of compelled testimony by the prosecution in its case in chief. *Id.* at 306–07, 105 S.Ct. 1285. *Miranda* creates a presumption of such compulsion. *Id.* at 307, 105 S.Ct. 1285. Thus, "the failure of police to administer *Miranda* does not·mean that the statements received have actually been coerced, but only that courts will presume the privilege against self-incrimination has not been intelligently exercised." *Id.* at 310, 105 S.Ct. 1285. Accordingly, *Elstad* reasoned that errors made by· the police in administering

*Miranda* warnings "should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself" and thus concluded:

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309, 105 S.Ct. 1285.

We adopted the reasoning of *Elstad* in *People v. Mendoza–Rodriguez,* 790 P.2d 810, 814 (Colo.1990); *see also People v. Trujillo,* 938 P.2d 117, 125–26 (Colo.1997); *People v. Dracon,* 884 P.2d 712, 720 (Colo. 1994). Accordingly, pursuant to *Elstad* and *Mendoza–Rodriguez,* if Defendant's pre-*Miranda* statements were given voluntarily, then Defendant's post-*Miranda* statements "are admissible so long as they were voluntary." *Dracon,* 884 P.2d at 720. In determining the voluntariness of a statement, a trial court must consider the totality of the circumstances surrounding it. *Trujillo,* 938 P.2d at 126. The prosecution must prove by a preponderance of the evidence that the statement was made voluntarily. *Id.* A statement is voluntary if it is the product of an individual's "free and rational choice." *Mendoza–Rodriguez,* 790 P.2d at 816. "The question is whether the individual's will has been overborne." *Id.* " 'Coercive police activity is a necessary predicate to the finding that a confession is not voluntary.' " *Id.* (quoting *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "Psychological coercion as well as physical coercion may render a statement involuntary under some circumstances." *Id.* "To be voluntary, a statement 'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Id.* (quoting *Brady v.*

*United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

The trial court found that both the statements made to Officer Soper and the statements made to Officer Hilling were voluntary. With regard to the voluntariness of the statements made to Officer Soper, the trial court found that the actual interrogation was very short in duration, having not lasted more than a minute or two; that Defendant fully understood the circumstances that were involved; that the officers acted in a fairly courteous manner; and that the statements were not the result of overt or implied threats or promises, duress, undue influence, coercion, or other untoward police conduct. (R. at vol. II, pp. 135–36.) With regard to the voluntariness of the statements made to Officer Hilling, the trial court found that Defendant was fully informed of his rights; that he knowingly, intelligently, and voluntarily waived those rights; that Defendant was not handcuffed or dressed in jail attire at the time of the interview; that the conversation occurred in an interview room and was extremely brief; that Officer Hilling approached the interview in a very relaxed and casual way, explained why he was there, and asked very specific and limited questions directed to that purpose; that Officer Hilling made no overt or implied threats or promises; and that the statements were not the product of any duress, undue influence, coercion, or other untoward police conduct. (R. at vol. II, pp. 133–34.) These findings are supported by the record. Because Defendant's statements made to Office Soper, although in violation of *Miranda* were made voluntarily, *Elstad* and *Mendoza–Rodriguez* permit the admissibility of the voluntary statements Defendant made to Officer Hilling after receiving, and then waiving, his *Miranda* rights. Accordingly, we reverse the trial court's suppression of these statements.

## III. CONCLUSION

We hold that stopping Defendant's vehicle to effect the arrest of his passenger constituted a seizure of Defendant. This seizure, however, was reasonable and thus constitutionally permissible. The statements Defen-

dant made to Officer Soper, however, were the products of custodial interrogation, and because Defendant had not yet received *Miranda* warnings, these statements must be suppressed. Both the statements made to Officer Soper, although in violation of *Miranda*, and the statements made to Officer Hilling were voluntary. Accordingly, the post-*Miranda* statements made to Officer Hilling at the jail are admissible under *Elstad* and *Mendoza–Rodriguez*. We therefore affirm in part, reverse in part, and remand this case for further proceedings consistent with this opinion.

Justice MARTINEZ specially concurs and Chief Justice MULLARKEY joins in the special concurrence.

Justice MARTINEZ specially concurring:

I agree with the majority's analysis and conclusion under *Miranda* and the Fifth Amendment affirming the trial court's suppression of Taylor's pre-arrest statement and reversing the trial court's suppression of Taylor's post-arrest statement. However, I believe that the Fourth Amendment was not implicated by the trial court's suppression order and was not raised in Taylor's motion to suppress. I thus find that the majority's discussion and analysis of the issues under the Fourth Amendment is unnecessary and improper under our precedent mandating that we limit our review of interlocutory appeals to the issue on which the suppression was based. *See, e.g., People v. Melton,* 910 P.2d 672, 676 n. 5 (Colo.1996). Accordingly, I specially concur.

A review of Taylor's motion to suppress reveals that it was clearly limited in scope to the Fifth Amendment and *Miranda*. Of the seven paragraphs that comprise the motion, the first three recount the factual circumstances giving rise to the motion. The remaining four paragraphs allege violations of Taylor's Fifth Amendment and *Miranda*

rights and nowhere mention the Fourth Amendment. For example, the fourth paragraph asserts that "a reasonable person in Defendant's position would believe that he was not free to leave and was in police custody." [1] In support of this assertion, Taylor cites *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *People v. Archuleta,* 719 P.2d 1091 (Colo.1986), and *People v. Thiret,* 685 P.2d 193, 203 (Colo. 1984). All three of these cases address the Fifth Amendment.[2] In the fifth paragraph, Taylor contends that "[t]he statements were not volunteered but were responses to police interrogation or its functional equivalent." To support this allegation, Taylor relies on *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), and *People v. Lee,* 630 P.2d 583 (Colo.1981). Both of these cases address only the Fifth Amendment and *Miranda* and make no mention of the Fourth Amendment. In the last two paragraphs, Taylor contends that his questioning was "custodial" and "required the police to give *Miranda* warnings," and that the officers "deliberately elicited statements from [him] without a voluntary, knowing, and intelligent waiver of the right to counsel." Again, the cases cited by Taylor in support of these contentions all address the Fifth Amendment and *Miranda*, and those cases that also address the Fourth Amendment are clearly relied upon by Taylor to support his argument that he was subjected to custodial interrogation for purposes of *Miranda* and the Fifth Amendment.

In addition to the limited scope of Taylor's motion to suppress addressing only the Fifth Amendment, it is clear that the trial court's ruling suppressing the statements was based wholly on *Miranda* and the Fifth Amendment and not on the Fourth Amendment. Accordingly, I disagree with the majority's conclusion that "[o]ne of the factors on which the trial court premised its conclusion that

---

1. Although Taylor refers to "the roadside detention" in paragraph four, which may arguably be read as implicating the Fourth Amendment, *see, e.g., People v. Ortega,* 34 P.3d 986, 992–93 (Colo. 2001), a review of the entirety of the fourth paragraph, as well as the fourth paragraph in the context of the motion as a whole, reveals that Taylor's assertion is that he was in custody for purposes of the Fifth Amendment and *Miranda*

when he was pulled over, asked to leave his vehicle, and questioned by the police.

2. Although *Thiret* also addresses the Fourth Amendment, the context in which Taylor cites it makes it clear that he relied upon the case to support his argument that he was in custody for purposes of *Miranda* and the Fifth Amendment.

the police violated Defendant's Fifth Amendment rights was its finding that Defendant had been impermissibly detained." Maj. op. at 685. To support its contention, the majority cites the following excerpt from the trial court's ruling:

> To be honest ... I may have found differently if this was a situation where there was some legitimate reason to stop Mr. Taylor; [if] Mr. Taylor himself was suspected of having committed some kind of offense and they were going through this routine then, but under the circumstances ... he's essentially an innocent bystander they have placed under restrictions.

*Id.* at 685 n. 4 (citing R. vol. II at 131). However, a review of the entirety of the trial court's excerpt relied on by the majority reveals that the trial court did not base its Fifth Amendment analysis and conclusions on a Fourth Amendment inquiry or analysis. The complete trial court excerpt cited by the majority reads:

> To be honest ... I may have found differently if this was a situation where there was some legitimate reason to stop Mr. Taylor; [if] Mr. Taylor himself was suspected of having committed some kind of offense and they were going through this routine then, but under the circumstances ... he's essentially an innocent bystander they have placed under restrictions, *under these circumstances I think it was only reasonable for Mr. Taylor to conclude not only was Jennifer Tafoya placed under arrest—and that's what I wanted to mention.*

R. vol. II at 131 (emphasis added). Thus, the trial court's excerpt implies that Taylor would have reasonably believed that he, too, was under arrest, a concept that implicates the Fifth Amendment and *Miranda* rights and does not implicate the Fourth Amendment. Additionally, just seven lines after the foregoing excerpt, the trial court states in explicit terms that it is making its ruling

based on the Fifth Amendment and *Miranda* when it states, "Anyway, I find this to be a custodial interrogation and not [M]irandized, and for that reason, I find that the interrogation was illegal and the statements made at the scene in the Centennial Mall parking lot must be suppressed." *Id.*

Contrary to the majority's conclusion that the trial court considered the Fourth Amendment in reaching its conclusions, the trial court's oral ruling is peppered with statements that Taylor was in custody and was interrogated for the purposes of *Miranda* and that he was not *Mirandized* when he should have been. For example, the trial court stated: "I think the actions and words and context suggests that he was in custody. He was not free to leave." R. vol. II at 130. The trial court also stated: "I find this to be a custodial interrogation and not [M]irandized, and for that reason, I find that the interrogation was illegal and the statements made at the scene in the Centennial Mall parking lot must be suppressed." *Id.* at 131.

The trial court's use of several words and phrases that are commonly associated with Fourth Amendment jurisprudence does not convert either Taylor's motion or the trial court's ruling into ones that implicate the Fourth Amendment. These words, when viewed in the entire context of the hearing on the motion to suppress and the court's oral ruling on the motion, make it clear that the trial court decided Taylor's motion to suppress solely on Fifth Amendment and *Miranda* grounds. For example, the trial court's reference to "fruits of the poisonous tree" with regard to Taylor's statement to Trooper Hilling does not render the ruling or the motion ones that were based in the Fourth Amendment.[3] Instead, as the majority correctly states, the trial court erred in applying the fruit of the poisonous tree doctrine to Taylor's statement because that doctrine "does not apply to confessions obtained

---

**3.** By way of further example, the trial court stated that the interaction between Taylor and the police officers in the parking lot was an "encounter," which rings of Fourth Amendment jurisprudence's category of a consensual encounter. *See, e.g., People v. Morales*, 935 P.2d 936, 939 (Colo. 1997). At another point, the trial court stated that there "was clearly some type of detention" in the parking lot. Like "encounter," the term "detention" is associated with Fourth Amendment jurisprudence. *See, e.g., Ortega*, 34 P.3d at 992–93. As discussed above, these words and phrases, when considered in context, demonstrate that the trial court addressed Taylor's motion only on Fifth Amendment and *Miranda* grounds, and not on Fourth Amendment grounds.

after an initial confession that was voluntary but not preceded by *Miranda* warnings." Maj. op. at 693 (citing *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). The express recognition by the majority that the trial court erroneously applied the fruit of the poisonous tree doctrine because Taylor's Fifth Amendment and *Miranda* rights, as opposed to his Fourth Amendment rights, were implicated further supports my conclusion that the Fourth Amendment is *not* at issue in this interlocutory appeal.

The majority states that "the Fourth and Fifth Amendment issues raised by this case are inextricable." Maj. op. at 686. However, a review of the majority's Fifth Amendment analysis reveals that very little in that analysis takes advantage of the majority's Fourth Amendment discussion. Instead, the majority's discussion of the Fifth Amendment analysis is grounded in Fifth Amendment and *Miranda* concepts such as "custody" and "interrogation" and does not utilize Fourth Amendment jurisprudential concepts to inform its discussion of the Fifth Amendment. *See generally* maj. op. at 689–693. Indeed, in its discussion of the Fifth Amendment, the majority expressly notes the distinct differences between the Fourth and Fifth Amendments. *See id.* at 690 n. 8 ("[W]e have recognized that whether a person is seized under the Fourth Amendment and whether a person is 'in custody' for purposes of *Miranda* are constitutionally distinct inquires."). The only benefit I see from the majority's lengthy Fourth Amendment analysis is the conclusion that this was not a routine traffic stop. I believe that such an observation could be made without such lengthy discussion of the Fourth Amendment, a belief that is supported by the majority's independent conclusion in its Fifth Amendment analysis that "[u]nlike a routine traffic stop, Defendant was pulled over, not because he had violated the law, but because there was a warrant for Ms. Tafoya's arrest." Maj. op. at 692.

The majority also states that an analysis under the Fourth Amendment is necessary because if the statements could be suppressed under the Fourth Amendment's fruit of the poisonous tree doctrine an analysis under the Fifth Amendment and *Miranda* would be moot. However, we do not ordinarily consider and analyze issues not raised below, particularly when such consideration may leave the issues raised below, upon which the trial court based its decision, completely undiscussed. *See, e.g., Melton,* 910 P.2d at 676 n. 5.

I would limit our review of the trial court's suppression order to the grounds upon which that court granted the motion. We have customarily limited our decisions in interlocutory appeals in this manner. *See, e.g., People v. Lewis,* 975 P.2d 160, 175 (Colo.1999); *People v. Canton,* 951 P.2d 907, 911 n. 4 (Colo.1998) (articulating the general principle that in an interlocutory appeal we do not address issues not resolved by the trial court); *Melton,* 910 P.2d at 676 n. 5 ("The trial court's sole reason for granting Melton's suppression motion was its finding that the police officers' initial approach and questioning of Melton was not supported by reasonable suspicion of criminal activity.... Therefore, we limit our review of the trial court's rulings to whether the initial contact between the police and Melton was proper."). I would thus only consider the applicability of *Miranda* and the Fifth Amendment in considering the People's interlocutory appeal.[4]

Accordingly, I specially concur.

Chief Justice MULLARKEY joins in the special concurrence.

4. I would thus not reach, contrary to the majority, any conclusion regarding the admissibility of the cocaine found in Taylor's car. The admissibility of the cocaine was raised by neither Taylor in his motion nor by the trial court during the hearing and is not properly before this court. *See, e.g., People v. De Baca,* 736 P.2d 25, 27 n. 1 (Colo.1987).