Plaintiff–Appellant: **THE PEOPLE OF THE STATE OF COLORADO,**

v.

Defendant–Appellee: **Juan PASCUAL.**

No. 04SA400.

Supreme Court of Colorado.

May 16, 2005.

Kenneth R. Buck, District Attorney, Nineteenth Judicial District, Christian J. Schulte, Deputy District Attorney, Greeley, for Plaintiff-Appellant.

David Morgan, Greeley, Law Office of Marcia E. Wade, Marcia Elizabeth Wade, Lafayette, for Defendant–Appellee.

BENDER, Justice.

The People bring this interlocutory appeal pursuant to section 16–12–102, C.R.S. (2004), and C.A.R. 4.1., and challenge the trial court's suppression of incriminating statements made by the defendant, Juan Pascual. The People concede that Pascual was interrogated by the police when he made incriminating statements. However, the People argue that he was not in custody, as we have defined the term, and therefore these statements were not obtained in violation of his rights as set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial court found that Pascual was in custody based upon the totality of the circumstances including the length of detention, the number of officers and patrol cars at the scene, Pascual not being free to leave, and the nature and tenor of the interrogation. The uncontested evidence presented at the suppression hearing established that two police officers driving separate vehicles stopped Pascual and three other men in their van at approximately 10:45 p.m. The officers had difficulty communicating with the men, all of whom are Guatemalan and speak limited Spanish and virtually no English. After roughly thirty minutes, the officers called for additional assistance. At least four more officers arrived at the location of the stop, each driving a separate patrol car. The four persons were interviewed separately, outside, in thirty-degree temperature. At some point during this period from 10:45 p.m. to approximately 1:00 a.m., the police took the keys to the van and the four men's identification documents. The officers also maintained a constant surveillance on Pascual and the other men including while two used the restroom. Then, at approximately 1:00 a.m., the police transported Pascual to the police station in the back of a patrol car. At the station the police gave Pascual three admittedly defective *Miranda* advisements before conducting three separate interrogations which lasted until 8:30 a.m. After the third interrogation period was finished, Pascual was formally arrested.

The trial court based its legal conclusion that Pascual was in custody on a number of factors. These objective factors are supported by the uncontested evidence contained in the record and the trial court's findings of historical facts. Thus, on de novo review, we hold that based on these objective factors, a reasonable person in Pascual's situation would consider himself to be deprived of his freedom to the degree associated with a formal arrest when he made incriminating statements during a police interrogation. Hence, we affirm the trial court's suppression order and remand this case to that court for further proceedings.

## Facts and Proceedings Below

The trial court heard testimony from six witnesses who were present during the stop of Pascual outside the bar. Five of whom were police officers called by the prosecution and one defense witness who was also in the van at the time of the stop but was not charged with a crime. There are a number of minor inconsistencies as to the details of what occurred, who was present, and the timing of events. Most, but not all, of these inconsistencies were not resolved by the trial court in its written order which concluded that Pascual was in custody once the two officers who made the initial stop determined that they had two "good suspects" and called a third officer who spoke Spanish to further question the suspects.

To guide the reader, we first present an overview of what happened before discussing in greater detail the uncontested facts testified to by the six persons present at the scene. Pascual and three companions were stopped by two police officers after they exited a bar at around 10:45 p.m. Neither Pascual nor his companions speak English and the trial court found that Pascual speaks Spanish below the sixth grade level. Pascual is Guatemalan and speaks a Mayan dialect, Kanjobal, as his first language. The two officers were armed, in uniform, and had arrived in separate patrol cars. These two officers questioned Pascual and the others for roughly thirty minutes. They then called for officer assistance once they determined that Pascual and another man were "good suspects" in a rape and kidnap crime that occurred the night before. Then, over the next one and one-half hours after this call was made, four more officers, at least three of whom were armed and in uniform, arrived on the scene in separate vehicles. The six officers kept the suspects separated, outside their van, in thirty-degree weather, while Pascual and the others were interviewed. Then at approximately 1:00 a.m., the police took Pascual to the police station where, over the next seven and one-half hours he was interrogated three times. During these interrogations, Pascual made incriminating statements.

On October 12, 2002, Officer Michael Pfeiler was on patrol when he saw what appeared to be a blue van which had been used by three Hispanic men in an alleged rape and kidnap committed the night before. Pfeiler followed the van into the parking lot of the same bar where the crime occurred the previous night. According to Pfeiler, three Hispanic looking men exited the van and went into the bar. A fourth man stayed in the vehicle. Pfeiler parked his patrol car so that he could maintain visual contact with the vehicle and radioed for officer assistance.

Sergeant Keith Olson appeared on the scene soon after Pfeiler called for assistance and parked his patrol car near the van shortly after 10:45 p.m. Pfeiler and Olson, who were both armed and in uniform approached the van.[1] Pfeiler obtained all four of the passengers' identification cards, including Pascual's, and checked for warrants.[2] Pfeiler did not remember when he obtained the keys to the van; however, he stated that he most likely had the keys when the van was towed to the police impound lot in the early morning, after the two suspects were brought to the police station for questioning.

Olson then spoke with one of the four men, Mario Velasquez–Marcos[3], away from the other three passengers who waited outside the van. Olson stated that because it was cold outside, roughly thirty degrees, he tried to find an area away from the wind to question the suspects. Olson and Velasquez–Marcos spoke outside the van, separated from the other three men, approximately twenty to twenty-five feet away from the van. The interview lasted roughly fifteen minutes. Then, while Pfeiler watched the van, Olson asked Pascual to come away from the van where the two of them spoke separately in Spanish for about five minutes.

Olson said that he interviewed all four men using the same location twenty to twenty-five feet away from the van. Although Olson stated that his Spanish language proficiency is limited, he also stated that during these interviews he learned each man's identifying information, including name and age, and that Velasquez–Marcos and Pascual had been at the bar the night before.

Once Olson determined that Pascual and Velasquez Marcos were "good suspects," either he or Pfeiler radioed for Officer Douglas Medhurst to come to the parking lot to conduct additional questioning. Both Olson and Pfeiler believed Medhurst to be more proficient in Spanish than they were and that his Spanish speaking abilities would help them to communicate with the suspects. However, the trial court found that both Velasquez–Marcos and Pascual are Guatemalan and speak Kanjobal as their first language and that both suspects speak Spanish but only below the sixth grade level.[4] Neither speaks English with any competency.

1. The trial court heard differing versions concerning the details of this initial contact. Pfeiler stated that he and Olson approached the van together with their revolvers holstered. He also said that the lights from his patrol car were not turned on. Olson stated that Pfeiler was standing outside the van with the four suspects when he arrived on the scene and that the lights from Pfeiler's patrol car illuminated the scene. One of the passengers of the van who is not a suspect in the case, Domingo Pascual, stated that he got into the driver's seat and started the vehicle at which point the flashing lights from a patrol car were turned on and then two officers approached the vehicle with their guns drawn.

2. Pfeiler stated that he believed that he returned the identification cards but none of the other officers could confirm this fact. Domingo Pascual who was not brought to the police station claimed that his identification was not returned to him until two to three hours after it was taken. The trial court acknowledged that identification was taken, but did not state whether or when Pascual's was returned to him.

3. Velasquez–Marcos is a co-defendant but is not a party to this appeal.

4. The level of Spanish language competency was a contested issue for the trial court. The People presented several witnesses who stated that the defendant spoke Spanish regularly at work and that according to the officers who questioned him at the scene, they could not perceive that Pascual had any difficulty communicating with them. Two experts testified for the defense that Pascual was not a proficient speaker of Spanish. One expert testified that neither is fluent in Spanish and that Pascual is "not a proficient speaker in Spanish at all." Another testified that during the interrogation, the detective's Spanish language skills were very poor and that the suspect's abilities were no greater than the officer's which was also poor.

Around 11:15 p.m., approximately one-half hour after Pfeiler and Olson made initial contact with the suspects, Officer Medhurst arrived. Over the next hour, Medhurst and Olson interviewed Velasquez–Marcos and then Pascual about the night before. During this time Velasquez–Marcos got into the back of a patrol car and drove with Olson and Medhurst to point out where a third suspect, Dagoberto Aguilar–Ramos, lived. The three were gone for roughly fifteen minutes.

Officer Douglas Steinhour arrived some-time after Olson.[5] He testified that he was only on the scene for roughly fifteen to twenty minutes. However, on cross-examination he admitted that his report established that he was at the scene for approximately two hours and ten minutes, from 10:50 p.m. to 1:00 a.m. While at the scene, Steinhour monitored the suspects and kept them separated. He also testified that he accompanied two of the four men into the restroom of the bar.

Pfeiler stated that a total of six officers eventually arrived on the scene, each in a separate patrol car. While some of the officers interviewed the passengers, others monitored the van. He also stated that the men were not allowed back in the van once they exited. Sergeant Olson corroborated this testimony and stated "I don't think there was a time when all four of [the passengers] were in the van" and that either Velasquez–Marcos or the defendant Pascual was always outside the van. None of the officers testified that they told the suspects that they were free to leave.

Around 12:30 a.m., Detective Denis Lobato arrived on the scene after Olson had called for an investigator. Lobato, who also speaks Spanish, talked with Velasquez–Marcos and Pascual for five to ten minutes each. Lobato stated that both suspects were standing outside the van and that the two others were in the van when he arrived. He told each of

the suspects that he was investigating a crime that occurred the night before and asked if they would accompany him to the police station. Then, according to Detective Lobato and Officer Steinhour, at around 1:00 a.m. Pascual and Velasquez–Marcos were transported to the police station in separate patrol cars for further interrogations. Lobato testified that the two men were not given the opportunity to drive themselves.

Although disputed at the hearing, the trial court found that the two were not hand-cuffed, searched, or given a *Miranda* warning on the scene and that each entered a separate patrol car voluntarily and in a non-confrontational manner.

At approximately 1:15 a.m., the police took Pascual to an interrogation room. After two hours at the station, Lobato began the first of three separate interrogations of Pascual at about 3:20 a.m.[6] During these interrogations which lasted to roughly 8:30 a.m., Pascual made incriminating statements. Then, more than nine and one-half hours after initial contact was made, Pascual was arrested.

In its written order the trial court found that the defendants were in custody the moment Officer Medhurst was called by Sergeant Olson to conduct a more in-depth interrogation of the suspects at approximately 11:15 p.m. It based this legal conclusion on several objective factors including "the length of the detention, the number of officers and squad cars involved, the suspects not being free to leave, [and] the nature and tenor of the interrogation of the defendants." Thus, the trial court found that Pascual was in custody for purposes of *Miranda* and suppressed all statements made by Pascual after Sergeant Olson called Officer Medhurst.

## Analysis

The People concede that Pascual made incriminating statements after he received a

5. The exact timeline in which the officers arrived is not clear from the evidence presented in the record or from the trial court's order.

6. A Spanish language expert testified that during this interrogation both Lobato and Pascual had a very difficult time communicating with each other and that Lobato often used wrong or made-up words in his questioning of Pascual. Lobato

gave Pascual a *Miranda* advisement in Spanish each time he began a new interview. Detective Lobato gave the identical *Miranda* advisement to Pascual which he gave to the third suspect that evening, Aguilar–Ramos, which this court held failed to accurately communicate the defendant's basic rights under *Miranda*. *People v. Aguilar–Ramos*, 86 P.3d 397 (Colo.2004).

defective *Miranda* advisement but challenge the trial court's finding that the statements were obtained during a custodial interrogation—in other words, a reasonable person in the defendant's situation would not believe that he was in custody. This argument is largely based upon the trial court's finding that Pascual did not resist riding in the patrol car to the police station and that he was not handcuffed.

In *Miranda v. Arizona*, the United States Supreme Court established that the Fifth Amendment of the United States Constitution prohibits the prosecution from introducing statements into evidence which were procured during a custodial interrogation unless the police provide the defendant with certain warnings. 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The principal threat the Court sought to combat was that of psychological coercion that occurs in a police dominated atmosphere where the defendant "cannot be otherwise than under compulsion to speak." *Id.* at 461, 86 S.Ct. at 1621. For these rights identified in *Miranda* to apply, the defendant must first be in custody, that is "deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612.

Since *Miranda*, this court has further refined how to determine whether a suspect was in custody when he made incriminating statements. To determine if a particular defendant was in custody, trial courts must decide whether "a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Matheny*, 46 P.3d 453, 468 (Colo. 2002); *see also, People v. Trujillo*, 785 P.2d 1290, 1293 (Colo.1990). A court is to consider the totality of the circumstances when deciding whether a reasonable person would believe that he was free to leave the officer's presence. *Matheny*, 46 P.3d at 468; *People v. Taylor*, 41 P.3d 681, 691–92 (Colo.2002); *People v. Thiret*, 685 P.2d 193, 203 (Colo. 1984). Objective factors that are illustrative but not controlling as to whether a suspect is in custody include: the time, place, and purpose of the encounter; who is present during the interrogation; what the officer says to

the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether the defendant's movement is limited during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions. *Matheny*, 46 P.3d at 465–66; *Taylor*, 41 P.3d at 692.

A trial court's determination of custody is a mixed question of law and fact that an appellate court reviews de novo. *Matheny*, 46 P.3d at 462. As an appellate court, we are not to engage in fact finding and will give deference to a trial court's finding of historical fact where it is supported by competent evidence in the record. *Id.* Thus, we must compare the evidence presented at the suppression hearing with the trial court's finding of fact.

Although there are some inconsistencies in the evidence presented at the hearing, the overall uncontested evidence presented at the suppression hearing supports the trial court's legal conclusion that Pascual was in "custody" when he made the incriminating statements based upon several objective factors including: 1) the length of the detention; 2) the number of officers and squad cars involved; 3) the suspects not being free to leave; and 4) the nature and tenor of the interrogation. We now turn to the record to see what evidence exists to support these objective factors.

It is undisputed that the defendant Pascual and the other three men were stopped at around 10:45 p.m. by two armed and uniformed officers. The testimony of Pfeiler, Olson, Medhurst, and Steinhour establishes that they were all at the scene for at least seventy minutes and possibly for more than two hours and ten minutes while the suspects were separated and then individually interviewed in a location away from the van. Then, at approximately 1:00 a.m., over two hours after initial contact was made, Pascual was transported to the police station where he was placed in an interrogation room. There, he sat for nearly two hours before

Detective Lobato gave him the first of three faulty *Miranda* advisements. Then, at about 3:20 a.m., Lobato conducted the first of three interrogations in broken Spanish. These interrogations lasted until 8:30 a.m.—an overall police detention of Pascual for over nine hours.

Turning to the number of officers, it is also undisputed that two police officers driving separate vehicles stopped the van. Pascual and the others were questioned for thirty minutes before additional officers arrived on the scene to conduct more questioning. Then, at least four more police officers arrived on the scene in separate patrol cars. Only Lobato stated that he was not in uniform, thereby placing at least five armed and uniformed officers at the scene and up to six patrol cars.

Pascual was not free to leave. Pfeiler and Olson both stated that neither Pascual or Velasquez–Marcos were allowed back into the van once the officers learned that they were at the bar the night before, leaving either one or both of the two suspects standing around outside in thirty-degree temperatures for roughly two hours. The officers kept constant surveillance on the four passengers of the van including while two of the men used the restroom. There is no indication that the police officers told Pascual that he was free to leave at any point or that he was given the option of driving the van to the police station.[7] At some point that evening, an officer took the keys to the van, leaving the men with no means of transportation to leave the parking lot if they so desired. Then, the police impounded the van while the suspects were at the station.

Finally, the testimony of the two Spanish language experts supports the trial court's finding that the suspects and the police had difficulty communicating with each other, thereby contributing to the nature and tenor of the interrogation. There is no evidence indicating that at any point before or during these interrogations Pascual was told that he was not required to speak with the officers or that he could leave. Pascual was questioned

on several occasions by three different officers speaking broken Spanish, outside a bar, at night, in thirty-degree temperature, away from his vehicle, for over two hours during which the officers told him that they were investigating a crime from the night before.

Therefore, we hold that the objective factors which the trial court based its legal conclusion that Pascual was in custody are supported by the uncontested evidence and the trial court's findings of historical fact. Thus, we must address whether based on these factors, a reasonable person in Pascual's situation would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest. To decide this question, we find guidance in two of our cases where we held that the defendant was in custody despite the defendant's compliance with law enforcement and not being formally arrested.

In *People v. Taylor,* we considered the factors of a lengthy detention in a "police dominated atmosphere" where the defendant's movements were controlled and held that the defendant was in custody for purposes of *Miranda.* 41 P.3d at 693. There, the defendant's vehicle was stopped by two officers in order to arrest a passenger with an outstanding warrant. After nineteen minutes at the scene, three officers surrounded the defendant outside his vehicle where he then admitted that a case in his vehicle contained cocaine. *Id.*

Similarly, we held that the defendant was in custody despite the fact that police had not drawn weapons, used handcuffs, or used the type of force typically associated with an arrest in *People v. Polander,* 41 P.3d 698, 705 (Colo.2001). In *Polander,* law enforcement was granted permission to search a van and found drugs that belonged to the defendant. Thus, despite the lack of the use of force and the fact that the defendant was not under formal arrest, "it [was] clear that the defendant had every reason to believe she would not be briefly detained and then released." *Id.*

---

**7.** *Compare Matheny,* 46 P.3d at 467 (defendant approached at work by agent with whom he was familiar, drove himself to the station where he

was met by his mother, and also told that he was not under arrest and that he could leave at any time).

Here, like in *Taylor*, Pascual was subject to a lengthy detention of over two hours in a police dominated atmosphere. In addition, Pascual's compliance with law enforcement is similar to the defendant's in *Polander*. There, the defendant was not handcuffed, the police did not draw their weapons or use force but yet we still determined that the defendant was in custody. In this case, after thirty minutes, four more officers arrived on the scene and conducted further interrogations where Pascual was told that the officers were investigating a crime from the night before. The keys to the van were taken and then Pascual was brought to the police station in the back of a patrol car. Based upon these police actions, Pascual had no reason to believe that he would be briefly detained as in the case of an investigatory stop or for a minor offense.

The holdings in *Taylor* and *Polander* are consistent with precedent in other jurisdictions. Professor LaFave states that courts are more likely to find custody when "the police remove the suspect from [his friends or other third parties]" or "when the suspect was confronted by several officers instead of just one, ... and when the questioning was lengthy rather than brief and routine." 2 W. LaFave et al., *Criminal Procedure*, § 6.6(f), at 538–39 (2nd ed. 1999 & Supp.2005). *See, e.g., United States v. Kennedy*, 573 F.2d 657 (9th Cir.1978) (holding stop of defendant by four agents, two of which questioned him for forty-five minutes in back of agent's vehicle amounted to custody); *Commonwealth v. Magee*, 423 Mass. 381, 668 N.E.2d 339 (1996) (holding defendant was in custody when interviewed in closed room at police station over period of seven hours, not told she could leave, and where questions focused on criminal involvement in the death of her son); and *State v. Werner*, 9 S.W.3d 590 (Mo.2000) (holding that defendant who was unfamiliar with police procedures and functioning at fourth-grade level was in custody when isolated from friends and family and questioned by two officers who did not tell him that he was free to leave).

Therefore, on de novo review, we hold that based on the objective factors of the length of detention, number of police officers, not being free to leave, and nature of the interrogation present in this case, a reasonable person in Pascual's situation would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest. Hence, we affirm the trial court's legal conclusion that Pascual was in custody once Officer Medhurst was called to conduct a more thorough interrogation of the suspects. Therefore, any statements made by Pascual after this point violated the defendant's rights as set forth in *Miranda*.

**Conclusion**

We affirm the trial court's finding that the defendant Pascual was in custody and therefore was entitled to the rights outlined by *Miranda*. Hence, we affirm the trial court's suppression order and remand this case to that court for further proceedings.

Justice KOURLIS dissents, and Justice RICE and Justice COATS join in the dissent.

Justice KOURLIS dissenting.

The Majority sustains the trial court's suppression order, finding the order justified by "objective factors supported by uncontested evidence contained in the record and the trial court's findings of historical facts." Because the trial court made no finding of historical fact that would support the conclusion that the defendant was in custody for *Miranda* purposes, I disagree. Accordingly, I would reverse the trial court's order and remand for additional findings of historical facts. I therefore respectfully dissent.

**I. Background**

On October 12, 2002, D.V. and her husband, L.V. reported to police that she had been kidnapped and sexually assaulted by three "Guatemalan" males occupying a blue Chevrolet GMC minivan. The victim reported that the incident occurred in the vicinity of the Break Bar, located in Greeley, Colorado. She disclosed that she and her husband had encountered the van while leaving the bar on foot. As the van approached them, one suspect pushed her husband away and pulled her into the van. She stated further

that she was then sexually assaulted by the occupants who used a knife to subdue her.

On October 12, at about 10:45 p.m., Officer Pfeiler spotted a blue minivan matching that described by the victim and her husband. He followed the van for about two blocks into the parking lot of the Break Bar where he parked and radioed dispatch to contact the investigating officer. Sergeant Olson was the second officer on the scene. Both he and Officer Pfeiler eventually contacted the suspects and obtained their identification. Because none of the suspects appeared fluent in English, Officer Pfeiler could not communicate with them. Sergeant Olson, who had limited Spanish speaking abilities, attempted to communicate with the vehicle's four occupants. He spoke with each separately away from the van for about 15 minutes. Ultimately, Sergeant Olson determined that the circumstances called for an Officer with better Spanish speaking abilities. To that end, either he or Officer Pfeiler contacted Officer Medhurst, who arrived about 15 to 20 minutes later. At least three other officers appeared at the scene either sometime after or before Medhurst. The question of the time of arrival of each officer was not resolved by the trial court's findings. Similarly, other relevant facts and circumstances were the subject of conflicting testimony at the suppression hearing, and were left unresolved by the trial court.

Following the hearing on the defendant's motion to suppress, the trial court issued an order suppressing any statements made by the defendants to the officers after Sergeant Olson contacted Officer Medhurst. The court held that the officers' initial contact with the defendants was justified by a reasonable articulable suspicion and therefore constituted a valid investigatory stop. The court found, however, that "the scope and character of the investigatory stop was reasonably related to its purpose until the point

that Sergeant Olson called for Officer Medhurst to conduct a more in-depth interrogation." It therefore suppressed the defendants' statements, holding that they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## II. Discussion

We have characterized a trial court's custody determination as a mixed question of law and facts, and therefore, one we review de novo. *People v. Matheny,* 46 P.3d 453, 459 (Colo.2002). However, our conclusion to that effect was never intended to contravene the basic precept that as an appellate court we do not engage in resolving disputed factual issues. When reviewing the trial court's custody determination we are always guided by the trial court's findings of historical facts, to which we give deference if supported by the record. *Id.* at 462.[1]

Accordingly, we are not concerned here with whether, in hindsight, examination of the record reveals evidence that would support the trial court's statement of the relevant legal principle. We are merely concerned with three matters: (1) whether the court made historical findings of facts; (2) whether the court's historical facts are justified by competent evidence in the record; and (3) whether application of the law to the facts found by the trial court justifies its conclusions.

The Supreme Court established that in determining whether *Miranda* warnings are due, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). We have interpreted the court's holding as directing that *Miranda* rights are triggered "when police detain a suspect using a degree of force more tradi-

---

1. In *Matheny,* 46 P.3d at 462, we explained the standard as follows:

> As an appellate court, we will not engage in fact finding, and thus, a trial court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by the record. However, law application, which involves the application of the controlling legal standard to the facts established by the evidence and found by the trial court is a matter for de novo appellate review .... Determining whether a defendant is in custody for *Miranda* purposes ... requires us to apply a controlling legal standard to the facts found by the trial court.

tionally associated with concepts of 'custody' and 'arrest' than with a brief investigatory stop." *See People v. Polander*, 41 P.3d 698, 705 (Colo.2001) (quoting *People v. Breidenbach*, 875 P.2d 879, 887 (Colo.1994)).

The trial court found that the investigatory stop in this case was justified by reasonable articulable suspicion but concluded that the officers' contact with the defendants was transformed into a custodial interrogation at the point at which one officer contacted a police translator. The court alluded sweepingly to the legal factors motivating its decision, namely, "the totality of the circumstances, the length of the detention, the number of officers and squad cars involved, the suspects not being free to leave, the nature and tenor of the interrogation of the defendants." The court, nevertheless, failed to make any findings of historical facts that justified its conclusion that each of those factors existed. More to the point, the trial court's historical findings of fact, when measured against the relevant law and the record in this case, seem to weigh more heavily in favor of a contrary conclusion than the one the trial court reached.

At the outset, in determining whether the defendant is in custody for *Miranda* purposes, this court has considered significant evidence that the officers drew their guns, used handcuffs, or "otherwise demonstrated the kind of force typically associated with an arrest." *See Breidenbach*, 875 P.2d at 886. Here, the trial court expressly found that the officers had not handcuffed or searched the suspects. Moreover, the court heard conflicting testimony from a defense witness and the officers, concerning whether any of the officers had in fact displayed their weapons, and did not make any findings as to which testimony it believed. We have certainly held that a defendant may be seized even in the absence of a display of weapons or handcuffing by the police. However, since the proper inquiry is whether a reasonable person would believe he was in police custody of the degree associated with a formal arrest, we have upheld a conclusion of custody without a show of force "under circumstances in which it was apparent to all that the police

had grounds to arrest the occupants of the vehicle." *See Polander*, 41 P.3d at 705 (noting that the officers sought to question the defendant about illegal contraband the officers found upon conducting a valid search).

As the Supreme Court has made clear, "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question." *See Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

Here, the record indicates that Officer Pfeiler had followed the van as it made its way to the parking lot of the Break Bar. He parked and maintained visual contact with the van. Sergeant Olson arrived later and parked. The two officers exited their vehicles and were on foot when they approached the parked vehicle in the parking lot of the bar. The officers were in uniform and carried weapons—possibly holstered or possibly displayed. In sum, whether the officers exhibited conduct exceeding that associated with a stop was an issue that the trial court did not resolve.

Furthermore, the court made insufficient findings in support of its conclusion that the length of the detention elevated the encounter to custodial. The court drew a line of demarcation between a valid investigatory stop and custody at the point at which Sergeant Olson decided to contact Officer Medhurst. Yet, it noted that Sergeant Olson's conversations with the four suspects lasted only 30 minutes, and the record indicates that Medhurst was contacted immediately thereafter. The court did state that the officers were on the scene for a total of one hour and ten minutes, but did not make clear how that overall time span was bisected by the contact with Officer Medhurst. Moreover, the court emphasized that the officers had difficulty communicating with the vehicle occupants.[2] Yet the court neglected to allow a

---

2. And the record indicates that the officers con-

tinued to diligently pursue the investigation in-

period of time within which the officers could appropriately try to remedy that inability to communicate with the suspects. *See People v. Avalos,* 47 Cal.App.4th 1569, 1577, 55 Cal. Rptr.2d 450 (1996) (holding that length of detention, which was extended for additional 15 to 20 minutes because of need to obtain Spanish-speaking officer to communicate with defendant, was not unreasonable).

Further, the trial court's historical facts do not support any conclusion that the number of officers on the scene at the point at which Sergeant Olson determined that he could use Officer Medhurst's assistance triggered *Miranda* requirements. The court found only that there were a total of six officers on the scene. At minimum, the record indicates that at the point Officer Medhurst was called, only two officers were present, Sergeant Olson and Officer Pfeiler. At most, the record discloses conflicting testimony concerning the number of officers in the parking lot of the bar at the moment of Officer Medhurst's arrival, and that conflict is not resolved. The victim had reported that she had been kidnapped and raped at knife point by several males occupying a van matching the one driven by the defendants. The trial court explicitly noted that the initial stop was justified by reasonable articulable suspicion. The record suggests that, excluding Officer Medhurst, at least four other officers could have appeared on the scene as a result of the initial dispatch. Whether that number of officers was disproportionate to the circumstances or to the nature of the investigation is not an issue that the trial court addressed.

Similarly, there was conflicting evidence about whether the Officers had impeded the van's movement such that Pascual and the other occupants did not feel free to leave. There is some evidence that the officers had taken the keys to the van, but, based upon the testimony, that may have occurred after the suspects were allegedly in custody. The court did note that each suspect was interviewed separately for 15 minutes away from the bus. The court did not discuss specific distance but Sergeant Olson testified that each suspect was asked to walk away a short distance from the van. Merely having the

suspect move a short distance to facilitate conversation does not itself constitute custody. *See* 2 Wayne R. LaFave, *et al., Criminal Procedure* § 6(f), at 539 (2d ed.1999 and Supp.2005).

Lastly, although the court highlighted the nature and tenor of the interrogation as one factor supporting a conclusion of custody, the court pointed to no evidence that justified that conclusion. To the contrary, it expressly noted that Sergeant Olson was "non-confrontational with the defendants." *See People v. Minjarez,* 81 P.3d 348, 356 (Colo.2003) (noting tone of interview in which officer confronted the defendant with the evidence against him and with his own belief in the defendant's guilt); *People v. Viduya,* 703 P.2d 1281, 1284 (Colo.1985) (citing officer's tone and general demeanor).

The trial court pointed to Sergeant Olson's statement that his decision to call Officer Medhurst was motivated in part by his conclusion that the van's occupants were "good suspects" and concluded that Sergeant Olson had called Officer Medhurst to conduct a more "in-depth interrogation." The trial court, however, did not suggest that Sergeant Olson had made his intentions known to the suspects or point to any facts justifying the conclusion that the officer was called to conduct an in-depth investigation; the record also does not support such a finding. It is well established by this and other courts, that "despite the broad range of factors a court may consider … a court may not rest its conclusion that a defendant is in custody for *Miranda* purposes upon a 'policeman's unarticulated plan'." *Minjarez,* 81 P.3d at 353. In sum, the officer's "knowledge, intentions, or beliefs are only relevant to a custody determination to the extent that they affect how a reasonable person in the defendant's position would evaluate his situation." *Id.*

Here, the trial court emphasized in its historical findings of fact that the defendant speaks no English, his native tongue is Kanjobal and that he "speaks some Spanish but doesn't understand much." The record indicates that Sergeant Olson could converse

cluding interviewing witnesses at the bar and

having the victim identify the vehicle.

minimally with the defendant and the others because of his limited Spanish speaking abilities. The court cited to testimony by one defense witness that "the officer didn't speak much Spanish so they didn't understand each other very well." Thus, the court's findings are subject to the interpretation that a reasonable person in Pascual's position would have perceived that Officer Medhurst was called because Sergeant Olson had difficulties communicating with him and not because the situation had escalated from a brief investigatory stop to a custodial context. We have made plain that the trial court's application of the improper legal standard requires reversal and remand. *See Viduya*, 703 P.2d at 1287. To be sure, we have, in other contexts, concluded that despite the trial court's improper reliance on the officer's intent, the totality of the circumstances nevertheless justified upholding the court's suppression order. *See Minjarez*, 81 P.3d at 356.

## III.   Conclusion

A trial court need not address every contested issue, or write painstakingly long orders. On the other hand, the findings must be sufficient to support the ultimate legal conclusion. Here, although there may well have been evidence from which the trial court could have reached the conclusion that Pascual was in custody and should have been given *Miranda* warnings, the findings do not buttress that conclusion and the evidence is conflicting. I would therefore reverse the trial court suppression order and remand for further findings of historical facts by the trial court.

I am authorized to state that Justice RICE and Justice COATS join in this dissent.