**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Spencer Klinton SMITH, Defendant–Appellant.**

No. 08CA2071.

Colorado Court of Appeals, Div. VI.

Sept. 2, 2010.

As Modified on Denial of Rehearing Sept. 30, 2010.

John W. Suthers, Attorney General, Corelle M. Spettigue, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Sean C. Thomson, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

Defendant, Spencer Klinton Smith, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree criminal trespass. He also appeals the trial court's order regarding presentence confinement credit. We affirm the judgment of conviction, reverse the trial court's denial of a portion of defendant's presentence confinement credit, and remand with directions.

## I. Background and Procedural History

### A. Events of April 27, 2008

At about 3 a.m. on April 27, 2008, while Ryan Ramos was visiting with some friends in his apartment, he saw defendant's gloved hand reach through an open window to unlock his front door. Defendant entered Ramos's apartment carrying a guitar case, and confronted Ramos about money that defendant felt Ramos owed him. Ramos later testified that he feared that defendant had a gun inside the guitar case.

A confrontation between defendant and Ramos over the alleged debt ensued. Both defendant and Ramos left the apartment and continued fighting in a grassy area across the street. Several Fort Collins police officers were dispatched to the vicinity on reports of the fighting. When Officer Van Meter arrived on the scene, he observed defendant and Ramos; got out of his car and identified himself; and observed defendant tossing aside "a long black something" (which turned out to be defendant's guitar case). Van Meter asked defendant what he had dropped. When defendant replied that he had dropped a shotgun, Van Meter drew his gun and ordered both Ramos and defendant to lie face down on the grass until a backup officer arrived.

When another officer arrived about one minute later, he "covered" Ramos and defendant while Van Meter found and recovered an unloaded shotgun, which he found inside the guitar case. Van Meter asked defendant if he had anything else on him, and defendant told Van Meter he had two shotgun shells in his pocket. Van Meter then searched defendant for weapons and recovered the shells.

As part of the investigation concerning the altercation, Van Meter interviewed defendant, while one of the other officers interviewed Ramos. In that regard, Van Meter testified as follows at a subsequent suppression hearing:

Van Meter: I asked [defendant], "Stand up." Did not place him into cuffs. And I began my interview of him at that time. I asked him if he wanted to sit in the back of the patrol car, because it was cold. I clearly stated to him that he was not under arrest, but I was working on the investigation. I did not place him in handcuffs.

Prosecutor: When you asked if [defendant] wanted to go in your car because it was cold, what did he respond?

Van Meter: He said, yes, that would be fine.

Prosecutor: Once he got in the back of your car, did he sit in there with the door open, closed?

Van Meter: He closed it himself.

According to Van Meter, his interview with defendant lasted for fifteen to twenty minutes. During the interview, Van Meter did not advise defendant of his *Miranda* rights. After the interview, Van Meter made small talk with defendant in the car until the other officers finished interviewing Ramos and investigating inside Ramos's apartment. In total, according to Van Meter's testimony, defendant was in the patrol car for no more than thirty minutes.

After Van Meter and the other responding officers conferred, they decided they had probable cause to arrest defendant for first degree criminal trespass. The police then took defendant into custody and transported him to the detention center where he was advised of his *Miranda* rights.

### B. Procedural History

Defendant was charged with one count of second degree burglary, one count of menacing, and one count of first degree criminal trespass. The prosecution later dismissed the menacing charge.

Prior to trial, defendant filed a motion to suppress. In his motion, defendant argued that (1) his initial encounter with Van Meter amounted to an arrest without probable cause, and (2) he was "subjected to custodial interrogation ... without first being advised of, and without ever voluntarily and intelligently waiving his rights under *Miranda v. Arizona*." The trial court denied the motion, concluding that Van Meter had not arrested defendant, but, rather, only subjected him to a valid investigatory stop. The trial court also found that Van Meter's use of force during the investigatory stop was a reasonable precaution for officer safety. Finally, the trial court concluded that defendant was not in custody during the interview in the patrol car.

The jury returned a verdict of not guilty on the burglary charge, but found defendant guilty of first degree criminal trespass.

The trial court sentenced defendant to three years of intensive supervised probation, conditioned upon serving a sentence of ninety days in the county jail. The court noted that, while defendant had spent eighty-nine days in jail prior to trial and sentencing, the court was going to award defendant only sixty days of presentence confinement credit:

> [T]here's a need for a punitive sanction, and the Court is going to sentence the defendant to 30 days at the Larimer County Detention Center. I do note the defendant previously served 89 days, but the Court feels it's appropriate that the defendant serve 30 days straight time in the Larimer County Detention Center. The Court finds that—simply wants to make sure the defendant understands that the use of weapons in situations like this just cannot be tolerated.

After defense counsel objected that the maximum jail term the court could impose as a condition of probation was ninety days, the trial court reaffirmed the sentence: "I'm not giving the defendant credit for all of the 89 days that he previously served. I'll give him credit for 60 days and impose the balance of [the] 90 days then."

This appeal followed. The trial court granted defendant bail and stayed his jail sentence pending the outcome of his appeal.

### II. Motion to Suppress

Defendant contends the trial court erred in denying his motion to suppress. Specifically, he argues that his initial encounter with Officer Van Meter was an arrest and that, because Van Meter lacked probable cause for the arrest, all evidence obtained from that encounter should have been suppressed. He also argues that, even if the initial encounter was not an arrest, the encounter became an arrest when Van Meter placed him in his patrol car. Thus, defendant urges us to conclude that any statements he made during the interview were inadmissible at trial as the product of unwarned custodial interrogation. We conclude the trial court did not err in denying defendant's motion to suppress.

[1, 2] When reviewing a motion to suppress, we defer to the trial court's findings of

fact if they are supported by competent evidence in the record, but we review the trial court's legal conclusions de novo. *People v. Heilman*, 52 P.3d 224, 227 (Colo.2002). Where the controlling facts are undisputed, the legal effect of those facts is a question of law, and we may review the issue de novo. *See Turbyne v. People*, 151 P.3d 563, 572 (Colo.2007); *People v. King*, 16 P.3d 807, 812 (Colo.2001).

## A. Initial Encounter

■ Defendant first contends the trial court erred in concluding that Van Meter's initial encounter with him was a valid investigatory stop. In particular, defendant argues that, because of the level of force that Van Meter used to secure the scene, Van Meter's actions amounted to an arrest, and this arrest was unconstitutional because it was not supported by probable cause. We disagree.

Our federal and Colorado constitutions protect against unreasonable searches and seizures. *King*, 16 P.3d at 812; *see* U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7.

■ On the spectrum of police-citizen encounters, which range from a full-scale arrest or search to a consensual encounter, an investigatory stop falls in the middle. *People v. Smith*, 13 P.3d 300, 304 (Colo.2000). Because an investigatory stop is an intermediate level of police response, it may be employed in narrowly defined circumstances upon less than probable cause. *Id.* The less exacting standard of "reasonable suspicion" applies to an investigatory stop, and, during an investigatory stop, officers may stop suspects and question them and conduct a pat down for weapons. *Id.; see Terry v. Ohio*, 392 U.S. 1, 26–30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). But an investigatory stop must be limited to determining an individual's identity or obtaining an explanation of his or her behavior. *King*, 16 P.3d at 814.

■ During an investigatory stop, an officer may take steps to ensure his or her own safety and that of any fellow officers. *Smith*, 13 P.3d at 305; *see King*, 16 P.3d at 814. This means that an officer may take physical control of or seize a suspect. *Smith*,

13 P.3d at 305. An officer may use force in detaining a suspect, and the fact that some force is used does not necessarily convert the police-citizen encounter into an arrest. *Id.* The appropriate inquiry is whether "such use of force was 'a reasonable precaution for the protection and safety of the investigating officers.'" *King*, 16 P.3d at 814 (quoting *Smith*, 13 P.3d at 305).

Our supreme court has noted that the trend developing since *Terry* has been to include within the rubric of investigatory stops the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force more traditionally associated with arrest than with investigatory detention when such measures are needed to protect the safety of the law enforcement officer and those around him or her. *People v. Archuleta*, 980 P.2d 509, 513 (Colo.1999) (the use of handcuffs does not automatically transform a detention into an arrest, nor is it unreasonable for an officer to draw a gun to confront a suspect when the gun provides "a justifiable measure of precaution ensuring [the officer's] protection in the course of conducting an investigatory stop."); *see King*, 16 P.3d at 816; *Smith*, 13 P.3d at 305.

Initially, we note that the record supports the trial court's conclusion that the police possessed reasonable suspicion to conduct an investigatory stop of defendant and Ramos in the first instance. *See King*, 16 P.3d at 816. Further, we conclude that the record supports the trial court's conclusion that Van Meter's use of force did not exceed the force necessary as a reasonable precaution during the investigatory stop. When Van Meter arrived at the grassy area, he faced a difficult and dangerous challenge in securing the scene. The scene was dark, and Van Meter was not able to tell if others, besides Ramos and defendant, were present. The situation worsened when Van Meter saw defendant toss aside the guitar case and defendant told Van Meter that there was an unsecured shotgun at the scene.

Van Meter testified at the suppression hearing that he could not, without assistance, secure both the scene and the two suspects. Therefore, Van Meter did what he could to

secure the suspects. He drew his gun and ordered both defendant and Ramos to lay face-down on the ground. Then, he "waited for another backup officer to arrive so [they] could search the area for any more weapons or how many more people." He then waited "[l]ess than a minute" for the other officer to arrive, and, while he did so, he placed defendant and Ramos in a prone position that mitigated the danger they posed.

Under the totality of the circumstances, we agree with the trial court that Van Meter's actions were reasonable precautions for his safety and the safety of the officers that later arrived to aid him. Accordingly, we conclude Van Meter did not exceed the level of force permissible during an investigatory stop.

### B. Patrol Car Interview

■ Defendant also argues that the trial court erred in concluding that the statements he made during his interview in the patrol car were not the product of unwarned custodial interrogation. We disagree, because we conclude that defendant was not in custody during the patrol car interview.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court prohibited the admission at trial of incriminating statements made during custodial interrogation unless the police first give the defendant certain warnings. *People v. Pascual,* 111 P.3d 471, 476 (Colo.2005); *People v. Taylor,* 41 P.3d 681, 689 (Colo.2002). In *Miranda,* the Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, *quoted in Taylor,* 41 P.3d at 689–90. This inquiry is distinct from the question of whether a person has been seized under the Fourth Amendment. *Taylor,* 41 P.3d at 690 n. 8.

■ The question of whether a suspect is in custody turns on an objective as-

sessment of whether a reasonable person in the suspect's position would believe himself or herself to be deprived of his or her freedom of action to the degree associated with a formal arrest. *Id.* at 691; *see People v. Holt,* 233 P.3d 1194, 1197 (Colo.2010). This inquiry requires consideration of the totality of the circumstances. *Pascual,* 111 P.3d at 476; *People v. Scheffer,* 224 P.3d 279, 287 (Colo. App.2009). In examining the totality of the circumstances, a court may consider a number of relevant factors, including:

> The time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officers['] tone of voice and general demeanor; the length or mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*Taylor,* 41 P.3d at 692; *see Holt,* 233 P.3d at 1197; *Pascual,* 111 P.3d at 476.

Here, the record shows that before Van Meter began his interview with defendant, the officer explicitly told defendant that he was not under arrest, and asked whether defendant "wanted to sit in the back of the patrol car, because it was cold." *See Smith,* 13 P.3d at 305 (placing a suspect in a police cruiser does not automatically transform a valid investigatory stop into a formal arrest). Defendant agreed, entered the patrol car, and closed the door himself. As Van Meter testified, because a patrol car's back doors open only from the outside, defendant was thereby prevented from leaving without outside assistance. However, there is no evidence in the record that defendant was aware of that impediment, and Van Meter also testified that at no point did defendant attempt or ask to exit the patrol car. Nor did the police handcuff defendant at any time during or prior to the interview or treat him differently from Ramos. *Cf. Holt,* 233 P.3d at 1198 (the court held the defendant was in custody where, among other factors, he was

handcuffed by police when they entered his apartment and when he agreed to be questioned, and the defendant was clearly the only prime suspect in a serious felony investigation). And, finally, as the trial court found, "the tenor of the conversation and encounter was one of cooperation, and lacked any indicia of force or coercion."

Under the totality of these circumstances, we conclude that a reasonable person in defendant's position would not have considered himself deprived of his freedom of action to the degree associated with a formal arrest. *See People v. Stephenson,* 159 P.3d 617, 620 (Colo. 2007); *Taylor,* 41 P.3d at 691. Accordingly, we conclude the trial court did not err in denying defendant's motion to suppress any statements he made in the patrol car.

### III. Presentence Confinement Credit

Defendant also contends the trial court erred by failing to give him presentence confinement credit (PSCC) for the full eighty-nine days he spent in jail before the court sentenced him to ninety days in jail as a condition of his sentence to probation. He argues that (1) the trial court was statutorily mandated to award him PSCC for the entire period of his presentence confinement; (2) alternatively, the trial court abused its discretion in only awarding him sixty days of PSCC; and (3) as applied here, the trial court's interpretation of the PSCC statute violates his rights under the Equal Protection Clause of the Fourteenth Amendment. We agree in part.

### A. Mandatory Versus Discretionary PSCC

█ Defendant first contends that the presentencing confinement credit statute, section 18–1.3–405, C.R.S.2009, mandates that the trial court award him PSCC and credit him for the entire period he spent in presentence confinement. We disagree.

PSCC "refers to the time credit a person earns when that person is in jail, unable to post bond, and awaiting sentencing on an offense." *Edwards v. People,* 196 P.3d 1138, 1139 (Colo.2008). Section 18–1.3–405 governs a defendant's entitlement to PSCC. It provides, in pertinent part:

A person who is confined for an offense prior to the imposition of sentence for said offense is entitled to credit against the term of his or her sentence for the entire period of such confinement. At the time of sentencing, the court shall make a finding of the amount of presentence confinement to which the offender is entitled and shall include such finding in the mittimus. *The period of confinement shall be deducted from the sentence by the department of corrections.*

(Emphasis added.) Because the resolution of defendant's contention turns on the proper interpretation of this statute, it presents "a question of law [that] we review de novo." *See Bostelman v. People,* 162 P.3d 686, 689 (Colo.2007).

In *Castro v. District Court,* 656 P.2d 1283, 1283–84 (Colo.1982), the supreme court held that the then-applicable version of the PSCC statute (which is substantively identical to the current version) did not "mandat[e] the deduction of the period of pre-sentence confinement from a sentence to a county jail." *Id.* at 1284. In *Castro,* the trial court refused to grant the defendant PSCC on his sentence to the county jail. *Id.* Based on the statutory language referring to the Department of Corrections (DOC), the supreme court concluded that the PSCC statute only requires a trial court to award PSCC if the person's "sentence is to be served in a state correctional facility." *Id.* Because the defendant was to be sentenced to a county jail rather than a state correctional facility, the defendant was not entitled to PSCC. *Id.* Under such circumstances, the supreme court held the trial court was permitted but not required to award PSCC. *Id.* at 1284 n. 3; *see also People v. Johnson,* 797 P.2d 1296, 1299 (Colo.1990) ("[T]he trial court has discretion to give credit for presentence confinement on a sentence to county jail."); *People v. Lachicotte,* 713 P.2d 408, 409 (Colo.App. 1985) ("[I]f the defendant is sentenced to confinement in a facility not under the supervision of the Department of Corrections, it is within the discretion of the trial court whether to give the defendant credit for pre-sentence confinement.").

Defendant appears to concede that, if *Castro* correctly states the applicable law, the trial court here was not required to give him PSCC. Defendant further concedes that the supreme court has not explicitly overruled its holding in *Castro*, and, indeed, has reaffirmed that holding in subsequent cases. *See Beecroft v. People*, 874 P.2d 1041, 1045 n. 12 (Colo.1994) ("[I]f a defendant is sentenced to a facility that is not run by the DOC, such as a county jail, the sentencing court has discretion to award confinement credit."); *Johnson*, 797 P.2d at 1299.

Rather, defendant contends that the supreme court implicitly overruled *Castro* in *Edwards v. People*. We are not persuaded.

In *Edwards*, the supreme court held that "an offender who has earned PSCC is entitled to have that credit deducted from his mandatory parole." *Edwards*, 196 P.3d at 1139. In reaching its conclusion, the supreme court described the duties of the trial court and the DOC with respect to PSCC:

> Under Colorado's PSCC statute, section 18-1.3-405, the number of days that an offender spends in jail before sentencing is deducted from the offender's "sentence." The first three sentences of section 405 prescribe the manner in which PSCC must be calculated and deducted from an offender's sentence: at the time the defendant is sentenced to incarceration and mandatory parole, the trial court must calculate the total number of days the defendant has spent in confinement before sentencing and then note this number on the offender's mittimus. It then becomes the statutory obligation of the Department of Corrections ... to deduct the number of days of PSCC noted on the mittimus from the offender's "sentence."

*Id.* The supreme court emphasized that "the only judicial function [under the PSCC statute] is to make a finding of fact concerning the number of days spent by a defendant in presentence confinement." *Id.* at 1144 (quoting *Meredith v. Zavaras*, 954 P.2d 597, 605 (Colo.1998)).

However, unlike *Castro*, *Edwards* involved a defendant the trial court sentenced to a period of incarceration in the DOC followed by a period of mandatory parole. *Id.* at

1140. And the DOC was responsible for applying the PSCC to the parole portion of the *Edwards* defendant's sentence. *Id.* at 1144. Thus, *Edwards* did not present the question whether trial courts retain discretion to partially award or withhold PSCC when they sentence a defendant to a term of incarceration in county jail. Nowhere in its opinion in *Edwards* did the supreme court indicate that its holding in *Castro* was no longer good law, and we discern nothing in *Edwards* that would compel us to conclude the supreme court implicitly overruled *Castro*. Under these circumstances, we remain obligated to follow the rule the supreme court announced in *Castro*. *See, e.g., Silver v. Colo. Cas. Ins. Co.*, 219 P.3d 324, 330 (Colo.App.2009) ("[W]e are not at liberty to disregard [a] rule absent some clear indication that the Colorado Supreme Court has overruled it.").

Accordingly, we conclude that, under *Castro*, the trial court had discretion, but was not required, to award defendant credit for time spent in presentence confinement.

## B. Abuse of Discretion in Crediting PSCC

▪ Alternatively, defendant contends that, even if the trial court had discretion to grant or deny PSCC, it abused that discretion here by granting him credit for less than the full eighty-nine days he served in presentence confinement. We agree that the trial court abused its discretion.

In *People v. Johnson*, the supreme court limited a trial court's discretion to award PSCC when sentencing a defendant to a jail term. In *Johnson*, the supreme court concluded:

> [T]he trial court has discretion to give credit for presentence confinement on a sentence to county jail.

> However, the trial court must exercise this discretion in a manner which furthers the goal of section [18-1.3-405], that is, to insure that defendants receive full, but not duplicative, credit for the period of presentence confinement attributable to the

charge or conduct for which they were sentenced.

*Johnson,* 797 P.2d at 1299 (citation omitted).

Here, there is no dispute that defendant served eighty-nine days in presentence confinement, or that this period was entirely attributable to the charge for which defendant was sentenced. Thus, because the trial court chose to exercise its discretion to give defendant credit for his presentence confinement, the court was required to ensure that defendant received full credit for his presentence confinement. *See id.*

Accordingly, we conclude the trial court abused its discretion in awarding defendant only sixty days of PSCC when defendant served eighty-nine days in presentence confinement. *See People v. Wilson,* 251 P.3d 507, 508 (Colo.App.2010) ("A trial court abuses its discretion when it applies an incorrect legal standard."). Therefore, we reverse the trial court's ruling on PSCC and, as requested by defendant, remand for correction of the mittimus to reflect PSCC of eighty-nine days.

Because of our resolution of this matter, we need not address defendant's remaining contentions regarding PSCC.

The judgment is affirmed. The trial court's order denying defendant presentence confinement credit for an additional twenty-nine days is reversed, and the case is remanded with directions to correct the mittimus consistent with this opinion.

Judge GRAHAM and Judge MILLER concur.